*PH*

AO 91 (REV.5/85) Criminal Complaint                         AUSA Marc Krickbaum (312) 469-6052

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

MAR 15 2013
3-15-13
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

CAMERON HULL,
    also known as "Killa," and "Cam"

**CRIMINAL COMPLAINT**

**CASE NUMBER:**    MAGISTRATE JUDGE KEYS

**UNDER SEAL**    13 CR 0216

      I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: In or about November 2011, in the Northern District of Illinois, Eastern Division, and elsewhere, CAMERON HULL, also known as "Killa," and "Cam," defendant herein:

      knowingly transported Victim 1, an individual who had not attained the age of 18 years, in interstate commerce, from the State of Illinois to the State of Indiana, with the intent that Victim 1 engage in prostitution;

in violation of Title 18, United States Code, Section 2423(a). I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

                           Signature of Complainant
                           MICHAEL BARKER
                           Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

March 15, 2013                 at    Chicago, Illinois
Date                                City and State

Arlander Keys, U.S. Magistrate Judge
Name & Title of Judicial Officer             Signature of Judicial Officer

## AFFIDAVIT

I, MICHAEL BARKER, being duly sworn, state as follows:

### BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation, and have been since 2008. My responsibilities include the investigation of violent crimes, including bank robbery, gang and drug investigations, kidnaping, extortion, and crimes against children, including the sex trafficking offenses discussed in this affidavit. I have extensive training in the investigation of sex trafficking offenses, including training about the methods used by sex traffickers to recruit and maintain victims; means of sex trafficking, including the use of the Internet and sex trafficking on the street, also known as the "track;" methods of force, fraud, and coercion used by sex traffickers; travel in interstate commerce for purposes of sex trafficking; and sex trafficking jargon and tools of the trade.

2.      This affidavit is submitted in support of the following: (a) a criminal complaint alleging that in or about November 2011, CAMERON HULL, also known as "Killa," and "Cam," transported a minor named Victim 1 across state lines with the intent that Victim 1 engage in prostitution, in violation of Title 18, United States Code, Section 2423(a); (b) a warrant to search HULL's cellular telephone, which is currently assigned telephone number (504) 994-5053 and electronic serial number ("ESN") 268435459914867002[1], with service provided by Sprint/Nextel ("Subject Phone 1"); and

---

[1] Based on my training and experience, I know that an ESN is a unique identification number embedded or inscribed on a wireless phone by the manufacturer. The ESN is unique to each physical phone.

(c) a warrant to search HULL's Facebook account, more specifically, information associated with the Facebook account with User ID: 100000923283071, subscribed to CAMERON HULL, which is stored at the premises owned, maintained, controlled, or operated by Facebook, located at 1601 S. California Avenue Palo Alto, CA 94304 ("the Subject Facebook Account").

3.     As set forth below, there is probable cause to believe that HULL has committed a violation of Title 18, United States Code, Section 2423(a), as alleged in the criminal complaint, and there is probable cause to believe that in Subject Phone 1 and the Subject Facebook Account, there exists evidence, instrumentalities, and contraband relating to the sex trafficking of minors; sex trafficking by force, fraud, or coercion; and transporting victims, including minors, in interstate commerce for purposes of prostitution, in violation of Title 18, United States Code, Sections 1591, 2421, and 2423(a) ("the Subject Offenses").

4.     The information in this affidavit is based on interviews of victims and witnesses, my own observations and actions, information received from other law enforcement agents, consensually recorded telephone conversations, text messages, Facebook communications, toll records, pen register and trap and trace data, phone location information, online advertisements for prostitution, public records, my experience and training, and the experience and training of other agents. I have not included every fact I know about this investigation.

5.     This affidavit includes summaries of portions of certain consensually recorded telephone conversations, as well as text messages and Facebook

2

communications. These summaries are preliminary, they are not verbatim transcripts, and they are subject to change based on further review of the communications. The summaries do not purport to describe the entirety of the communications that are summarized. The affidavit includes my understanding of certain words spoken and written during the conversations. My understanding is based on my training and experience, the training and experience of other agents, and my conversations with victims, in particular, Victim 1.

## FACTS SUPPORTING PROBABLE CAUSE

### I.     Background and Summary

6.     According to HULL's Illinois driver's license, he is 32 years old and his last known residence is in Chicago, Illinois. The FBI is not aware of HULL having any legitimate form of employment.

7.     As set forth below, there is probable cause to believe that HULL is a pimp who, in November 2011, transported a seventeen-year-old girl, Victim 1, from the Northern District of Illinois to Indiana for purposes of prostitution. In addition, there is probable cause to believe that HULL has trafficked other victims both in the Chicago area and elsewhere, and that he has used Subject Phone 1 and the Subject Facebook account in furtherance of the Subject Offenses

3

II.    **HULL's Sex Trafficking of Victim 1**

    A.    **Meeting HULL**

    8.    Since about March 2012, FBI agents have conducted multiple interviews with Victim 1.[2] According to a copy of Victim 1's birth certificate, Victim 1 turned eighteen at the end of October 2012.

    9.    Victim 1 has identified HULL based on his unmarked Illinois driver's license photograph and other photographs. According to Victim 1, she met HULL in November 2011, soon after she turned seventeen, and she worked for HULL as a prostitute from about November 2011 to about December 2011.

    10.    According to Victim 1, she met HULL through a friend, Individual A, who told Victim 1 that she had worked with HULL as a prostitute, that HULL had posted advertisements of Individual A on the Internet, and that Individual A had made good money. On the day Victim 1 first met HULL, before she met him in person, she talked to him on the phone. During this conversation, HULL asked Victim 1's age, and Victim 1 initially lied and told HULL she was eighteen, even though she was only seventeen.

---

[2] Victim 1 has been paid approximately $2,250 for her cooperation with the FBI in this investigation. According to records from the National Crime Information Center, Victim 1 has no criminal convictions. In December 2012, Victim 1 told an FBI agent that she had not initially been completely truthful with the FBI, because she had initially told the FBI that after she left HULL, another person, Individual A, had not been involved in prostituting Victim 1. In December 2012, Victim 1 told the FBI that Individual A had, in fact, been involved in prostituting her. The information Victim 1 has provided the FBI has been repeatedly corroborated by interviews with other witnesses, consensually recorded telephone calls, Facebook messages, Internet advertisements, and other records. I believe Victim 1 to be reliable.

According to Victim 1, HULL asked if she was sure, and said that if she was younger that eighteen, HULL needed to take steps to deal with the situation, such as telling people that HULL was Victim 1's uncle. At that point, according to Victim 1, she told HULL that she was actually seventeen. Later that day, Victim 1 met HULL in person, and recognized his voice as the person she had talked to on the phone about her age.

11.     Victim 1 said that after she first met HULL in person, he drove her and other females in his van to a motel in Joliet, Illinois. At the motel, HULL took photographs of Victim 1 wearing revealing clothing, and HULL said he was going to use the photographs to "post," which Victim 1 understood to mean post Internet advertisements for prostitution. According to Victim 1, during the time she worked as a prostitute for HULL, HULL posted advertisements on the Internet, including on the website backpage.com for Victim 1 and others, and HULL also caused others to post such advertisements. Victim 1 said that HULL often used his cell phone to post these advertisements. Victim 1 explained that the advertisements typically included a photograph of the female or females being advertised, as well as a phone number, which customers called in order to schedule a "date." Victim 1 and other victims who worked for HULL then met the customers and had sex in exchange for money.

12.     Based on my training and experience, I know that backpage.com is a website that sex traffickers frequently use to post advertisements that offer females who are available to commit commercial sex acts. Advertisements frequently contain photographs of young women, which may or may not be photographs of the actual female being advertised. Users pay $10 per advertisement, and can re-post their

5

advertisements multiple times. When an advertisement is re-posted, it is moved up to the top of the web page. Backpage.com is one of several websites used for this purpose.

13.     According to Victim 1, HULL told Victim 1 how much money she should charge for dates, and the prices ranged from $100 to $200, depending on how long the date lasted. Victim 1 said that HULL required Victim 1 to give him a percentage of the money she made from commercial sex acts, and Victim 1 said this percentage was either 20% or 30%. Victim 1 explained that HULL often made Victim 1 use her share of the money to pay for expenses such as car repair, gas, marijuana, alcohol, and motel rooms.

14.     According to Victim 1, HULL transported victims to commit commercial sex acts in a white full size van. Victim 1 has provided the FBI with a photograph of Victim 1 in the interior of a vehicle. Both Victim 1 and Victim 4 have identified this as a photograph of Victim 1 inside HULL's van. According to a report from the Chicago Police Department, on October 12, 2011, police officers encountered HULL inside a 1992 Chevy van with Illinois license plate number K530661. Chicago Police Department records show that in December 2011, the police impounded the van. In a consensually recorded telephone call with Victim 1 on September 7, 2012, described in paragraph 27, Victim 1 asked HULL, "You comin' in that van? HULL replied, "No G. . . . [T]he police took my van."

6

**B. HULL Transports Victim 1 From Illinois To Indiana for Purposes of Prostitution**

15. Victim 1 said that soon after she met HULL in November 2011, sometime before Thanksgiving, HULL drove Victim 1 and several other females in his van from Joliet, Illinois to a motel that was close to the interstate in Hammond, Indiana.[3] According to Victim 1, HULL, Victim 1, and the other females stayed in one motel room, and Victim 1 saw HULL post advertisements for prostitution on backpage.com. Victim 1 explained that a customer eventually came to the motel room, and that before the customer arrived, HULL left the room. When the customer arrived, he picked out Victim 1 as the female he wanted to have sex with. Victim 1 had sexual intercourse with the customer, and the customer paid her money. Victim 1 gave a portion of the money to HULL, and HULL said that the customer cheated her, and did not pay the full price he was supposed to.

16. Victim 1 has provided the FBI with a photograph depicting three females on a bed, with two of the females wearing lingerie and kissing each other. Victim 1 identified herself in the photograph kissing Victim 6. According to Victim 1, HULL took this photograph on Thanksgiving day, and instructed Victim 1 and Victim 6 to kiss each other for the photograph. HULL stated that he wanted a photograph depicting "girl on girl" for backpage.com.

17. According to Victim 1, on a second occasion in November 2011, this time after Thanksgiving, HULL drove Victim 1 as well as three other females, identified as

---

[3] In 2011, Thanksgiving was on November 24.

Victim 2, Victim 3, and Victim 6, from the Chicago area to the same motel in Hammond, again using his van. Once again, HULL and the females stayed in a motel room, and Victim 1 saw HULL post prostitution advertisements on backpage.com using his cell phone.

18.     According to Victim 1, during the second trip to Hammond, she went on approximately four "dates," meaning she had sex with customers in exchange for money, including a date she and Victim 6 did together. Victim 1 said she made a total of approximately $400 during the second trip to Hammond, and again gave a percentage of that money to HULL.

19.     Records from Motel 6 located at 3840 179th Street in Hammond, Indiana, show that from November 17 to November 18, 2011, and from November 25 to November 26, 2011, a room was rented in the name of CAMERON HULL. Motel 6 is located just west of Cline Avenue and South of Interstate 94 in Hammond. Victim 1 has identified an unmarked photograph of the same Motel 6 as the motel where HULL took her and other victims to commit commercial sex acts in November 2011.[4]

20.     Records from backpage.com show an advertisement for prostitution posted on November 25, 2011. The advertisement lists a location of Northwest Indiana, including Hammond. The title of the advertisement states, in part, "Pick the girl of ur choice . . . std free," and instructs interested customers to call (773) 851-7520, which

---

[4] As described in paragraph 30c, in a consensually recorded telephone conversation with Victim 1 on November 14, 2012, HULL identified this motel, based on its proximity to Cline Avenue, as one where he had taken Victim 1 in Hammond.

is a phone number known to be used by HULL ("HULL Phone A").[5] The advertisement contains photographs of several young women, who Victim 1 has identified as Victims 2, 3, and 6—the same females Victim 1 said HULL brought to with her on the second trip to Hammond. Victim 1 identified the advertisement as one that HULL used to advertise her and the other victims during one of the prostitution trips to Hammond, Indiana that occurred during the time HULL trafficked Victim 1.

### C.    HULL's Additional Trafficking of Victim 1 and Others

21.    According to Victim 1, after the second trip to Hammond, HULL drove Victim 1 and Victim 6 from Indiana back to Illinois, to a motel near O'Hare airport, where they stayed for about two days. Victim 1 again saw HULL post prostitution advertisements on backpage.com, and Victim 1 went on approximately two or three "dates," where she had sex in exchange for money, at customers' locations. Again, Victim 1 gave HULL a portion of the money she earned. Records from backpage.com show an advertisement for prostitution dated November 27, 2011, advertising locations including "ohare," and containing the phone number for HULL Phone A, as well as a photograph Victim 1 has identified as Victim 6.

---

[5] HULL Phone A is linked to HULL in several ways. For example, according to records from DCFS, on two occasions in February 2012, HULL told DCFS employees that this was his phone number. Records from the Illinois Department of Healthcare and Family Services also list this as HULL's phone number. Finally, according to records from the Joliet Police Department, on October 12, 2011, Joliet police officers responded to an altercation between HULL and Victim 4, and HULL gave police officers this phone number.

22.     Victim 1 described how, soon after these activities near O'Hare, HULL drove Victim 1 and other females, including Victim 3, Victim 7, and Victim 8 to the "track" near Madison Street and Cicero Avenue on the west side of Chicago. Based on my training and experience, I know the track refers to areas where sex traffickers send victims out on the street to flag down passing cars and commit sex acts in exchange for money with the occupants of those cars, and I also know that the area near Madison Street and Cicero Avenue is close to several known tracks. According to Victim 1, she saw Victim 3, Victim 7, and Victim 8 work the track for HULL.

23.     Victim 1 explained that the same day she accompanied HULL to the track, HULL took Victim 1 and other females, including Victim 7 and Victim 8, to a motel in Joliet, Illinois. At the motel, HULL took Victims 1, 7, and 8 to the swimming pool. Victim 1 has provided the FBI with a photograph that depicts three females, one of whom is Victim 1, and all of whom are topless. Victim 1 identified the photograph as depicting her, Victim 7, and Victim 8 in the motel pool. According to Victim 1, HULL took the photograph and instructed the females how to pose for it. In a separate interview, Victim 4 also identified Victims 1, 7, and 8 in the photograph. As described in paragraph 30d, in a consensually recorded telephone conversation on November 14, 2012, HULL described this photograph and said that he used to have it saved in his telephone.

24.     Victim 1 explained that during the time she was with HULL, she developed romantic feelings for him. HULL had sex with Victim 1, complimented her, told her he wanted her to have his baby, and told her that he would make her his after

she turned eighteen. Based on my training and experience, I know that these are methods that sex traffickers commonly use to recruit and maintain victims, particularly victims who are vulnerable based on their youth and other factors.[6]

25.     According to Victim 1, she last saw HULL in December 2011. HULL took Victim 1 and others to meet another pimp in Chicago, and Victim 1 left HULL, in part, because she was afraid HULL was going to sell her to the other pimp.

### D.     Victim 1's Consensually Recorded Telephone Conversations with HULL

26.     Beginning in September 2012, at the direction of the FBI, Victim 1 communicated with HULL through Facebook messages, consensually recorded telephone calls, and text messages. This communication began on September 5, 2012, when Victim 1 sent HULL a message on the Subject Facebook Account. Victim 1 told HULL that she had recently given birth to a child and that money was tight, and Victim 1 asked HULL to send his telephone number so that Victim 1 could talk to him. HULL responded by telling Victim 1 to call him at one of two telephone numbers: (773) 655-8754 ("HULL Phone B")[7], and (312) 292-6488 ("HULL Phone C").

---

[6] According to Victim 1, she was a runaway who had lived in multiple foster homes and group homes, and at the time she met HULL she was living in a four-bedroom "flop house" on the south side of Chicago with approximately twenty other people.

[7] According to records from Sprint/Nextel, HULL Phone B is subscribed to "TOM TOM," at 656 W 103rd St, Apt 2N, Chicago, IL 60628. This is listed as HULL's address on HULL's Illinois driver's license and in a public database. In addition, according to records from DCFS, in February 2012, a man who identified himself as HULL used HULL Phone B to contact DCFS.

27.     On September 7, 2012, Victim 1 had two consensually recorded telephone conversations with HULL.[8] In the first conversation, which occurred at approximately 2:49 p.m., HULL was using HULL Phone B.

a.      Victim 1 asked HULL, "You still workin' [earning money through the commercial sex acts of prostitutes]." HULL replied, "Yeah, I still be busting some moves." HULL then asked Victim 1, "Do you got somebody to might keep your baby [could someone watch Victim 1's baby so that Victim 1 could work as a prostitute for HULL]?"

b.      Later in the conversation, HULL asked Victim 1, "How old you is now?" Victim 1 said, "I'm fixing to be 18 next month [October 2012]." HULL asked, "Next month," and Victim 1 said, "Yeah." HULL responded, "So when you gonna be ready to work [as a prostitute]? You trying to work today [Friday September 7]?" Victim 1 said, "I can't work today. I got my baby today," and suggested that she might be able to work Monday. HULL responded, "I can get you a ride . . . to take the baby if you need to take the baby 'cause you know Mondays ain't no good days, it's the weekend and shit. . . . You tryin' to get some bread [HULL could get someone to watch Victim 1's baby that night so that Victim 1 could work for HULL as a prostitute, because weekends were the best time to make money from prostitution]." At the end

_____

[8] Victim 1 identified HULL's voice on each telephone call attributed to HULL in this affidavit. In various telephone calls described below, Victim 1 referred to HULL as "Cam," an abbreviation of his first name, Cameron. The FBI's automated recording system shows that each of the consensually recorded telephone calls discussed in this affidavit were made to or from Subject Phone 1, HULL Phone B, and HULL Phone C, as described in the affidavit.

of the conversation, HULL told Victim 1 to call him back on "the other number" that HULL sent Victim 1, which HULL referred to as the "312" number.

28.     At approximately 2:59 p.m., Victim 1 had a second consensually recorded telephone conversation with HULL, who was using HULL Phone C.

a.     Victim 1 asked HULL, "You still be messing with [trafficking] the same girls as before [when HULL trafficked Victim 1]?" HULL replied, "I got some new girls." Victim 1 asked HULL if he was "taking trips to them hotels like up in Hammond, [Indiana, where HULL trafficked Victim 1 in November 2011]?" HULL said, "No, but I'm getting money [making money from prostitution], G. So you trying to get some bread, come on [come work as a prostitute for HULL]. Come get it. You gonna see for yourself." HULL continued, "I don't do Indiana. . . . I should though. . . . I should post up [post Internet advertisements for prostitution] in Hammond."

b.     Later in the conversation, HULL told Victim 1, "I might post an ad [for prostitution] up . . . in Indiana. You got some new pictures [photographs to use in a prostitution advertisement]?" Victim 1 said, "I only got the pictures that I had from before [from her previous time working as a prostitute for HULL in November 2011]." HULL said, "Send 'em to my other phone [HULL Phone B], send 'em to my phone like right now and shit." Victim 1 told HULL that she could not send photographs on her phone.

c.     Victim 1 asked HULL, "It's still . . . 20%, 80%? Give you 20% of what I make [Victim 1 was asking whether she had to pay HULL 20% of her earnings from commercial sex acts]?" HULL said that it had been 30%, but now it was 40%

13

because of gas costs. HULL added, "I gotta call right now man, he tryin' to . . . he just wants some head. He got 50 right now [a customer was calling HULL's phone and wanted to pay $50 for oral sex]." Later in the call, HULL told Victim 1, "Try and see what's up, G, and get your babysitter and shit [HULL was telling Victim 1 to get a babysitter so that she could work as a prostitute for HULL that night]."

        d.     Throughout the conversation, HULL and Victim 1 discussed by name or nickname Victims 2-8, who are discussed in more detail below.

        e.     Toward the end of the conversation, HULL asked Victim 1 about her appearance after her pregnancy, asking "did the baby fuck your stomach up?" HULL also asked whether Victim 1 had gained some weight and whether she had gotten her hair done. HULL then told Victim 1, "Go see what's up with your babysitter [see if someone could watch the baby while Victim 1 worked as a prostitute for HULL]. . . . 'Cause . . . I'm havin' a driver today so we gonna be gettin' drove around [a driver would drive HULL and his females to locations where the females would commit commercial sex acts]." Victim 1 said she would call HULL back, and he said, "All right. Hurry up."

     29.     On October 22, 2012, at approximately 5:24 p.m., Victim 1 had a consensually recorded telephone conversation with HULL, who was using HULL Phone B. HULL told Victim 1, "I was trying to call you the other day cuz I was in Indiana." HULL asked Victim 1 when she wanted to work, and Victim 1 asked HULL where did he "post up [post online advertisements for prostitution]." HULL told Victim 1 that he was going to go to Michigan, and "If you wanna go to Michigan [to work as

14

a prostitute] you can." Victim 1 said, "What's up there?" and HULL said, "Money. Hella money." HULL told Victim 1 that he would take three girls with him to Michigan, and told Victim 1 to "Call me Thursday," and "Don't forget." Victim 1 asked HULL, "You need some pictures [to post in prostitution advertisements]?" and HULL said he needed new pictures of Victim 1 because she had recently given birth.

30.    On November 14, 2012, at approximately 5:03 p.m., Victim 1 had a consensually recorded telephone conversation with HULL, who was using HULL Phone B.

a.    HULL said to Victim 1, "What's up baby? I miss you though man. When you gonna come see me, man. We need to get some . . . shit crackin' [HULL was asking when Victim 1 was going to come back to work as a prostitute for HULL]." HULL asked Victim 1 whether she wanted to "come out and work [as a prostitute] this weekend," stating, "I'll come get you like Friday night or something."

b.    HULL also talked to Victim 1 about HULL's "baby mama" who HULL said lived in Detroit, Michigan. HULL asked Victim 1, "You want to go up there [to Detroit], man?" HULL continued by saying, "I'm going up there to get some bread [money] though. I got a couple, like two more other girls and shit that's supposed to be going too [HULL was going to Detroit with two females who were going to earn HULL money by committing commercial sex acts]."

c.    Victim 1 told HULL that she had to go back to Indiana in the next couple of days, and asked whether HULL could meet her there. Victim 1 asked, "Can you meet me at the hotel that we was at last time? The um, what's it's called, the

15

[Motel] 6 or the [Motel] 8, whichever one it is, whichever number? [Victim 1 was asking HULL if he could meet her at the Motel 6 in Hammond, Indiana where HULL took Victim 1 to commit commercial sex acts in November 2011, as described in paragraphs 15, 17, 19]." HULL replied, "In Indiana?" and Victim 1 said, "Yeah." HULL responded, "That's on Cline Avenue, right?" As described in paragraph 19, the Motel 6 where HULL took Victim 1 to commit commercial sex acts in November 2011 is located off of Cline Avenue in Hammond.

        d.     Later in the conversation, HULL discussed the females he had with him when Victim 1 stopped working for him. HULL stated, "I had [Victim 2, Victim 7, Victim 8]." Later HULL stated that if Victim 1 came back to work for him, he could get them a room at the "Marriott." HULL continued, "We been in the swimming pools swimming naked." Victim 1 responded, "I see you remember that, huh?" HULL replied, "Hell yeah I remember that, I used to have that shit in my phone [HULL used to have a photograph on his phone of Victim 1 and others swimming naked]. When y'all was in there skinny dipping. It was you, [Victim 8] and . . ." Victim 1 said, "I still got it [Victim 1 still had the photograph of Victim 1, Victim 7, and Victim 8 swimming naked in the motel pool in Joliet, Illinois, as described in paragraph 23].

        31.     On November 26, 2012, at approximately 2:07 p.m., Victim 1 had a consensually recorded telephone conversation with HULL, who was using HULL Phone B. Victim 1 asked HULL, "You out in umm Michigan?" and HULL said, "Yeah." Victim 1 and HULL discussed Victim 1 coming to Michigan, and Victim 1 said she had some money to come to Michigan because she had gotten some for her birthday. HULL

asked, "When was your birthday baby?" and Victim 1 said, "My birthday just passed." Later in the conversation, HULL told Victim 1, "so bring your ass [to Michigan]. You gonna come, come on." HULL continued, "You gonna get your own ad [online advertisement for prostitution]. Bring your ass out here, man. Let me cuff . . . you up [be in a romantic relationship with you]." . . . Victim 1 replied, "You been saying that . . . you ain't done it yet." HULL responded, "You grown now, nigga [Victim 1 had just turned 18]. I really couldn't do what I wanted to . . . And I used to tell you that [HULL was not previously able to have the kind of romantic relationship he wanted with Victim 1 because she was underage]."

## III.    HULL's Sex Trafficking of Other Victims and Potential Victims

32.    The FBI's investigation has identified multiple other females, identified here as Victims 2-8, who are victims or potential victims who have or may have been trafficked by HULL.

### A.    Victim 2

33.    On January 25, 2012, an undercover law enforcement officer ("UC") responded to an advertisement in the "chicago escorts" section of backpage.com. The advertisement stated in part: "Hi guys . . . my place or yours . . . I am here to please u in every way possible. Your wish is my command. . . ." The advertisement listed the telephone number for HULL Phone A, listed the nickname for Victim 2, and contained photographs of a young woman who an FBI agent later identified as Victim 2, after meeting Victim 2 on January 25, as described below.

17

34. The UC exchanged several text messages and telephone calls with HULL Phone A, and arranged to meet a female at a motel in Bedford Park, Illinois, for the purpose of exchanging money for sex. Later on January 25, a young woman arrived at the motel, and FBI agents identified her as Victim 2 after she provided her Illinois driver's license. According to Victim 2, Victim 2's driver's license, and public databases, Victim 2 was eighteen years old at the time.

35. FBI agents interviewed Victim 2 on January 25. Victim 2 said that she had used HULL Phone A to arrange a meeting with the UC with the understanding that Victim 2 would have sex in exchange for money. Victim 2 identified HULL, whom she referred to as "Kill," and "Cam," as her pimp. According to Victim 2, HULL posted Victim 2 and other victims on the Internet for the purpose of prostitution.

36. During the interview with the FBI, Victim 2 received a text from HULL Phone B, stating, in part, "U need to call me asap the police fuckin wit kamont," which Victim 2 explained was a text from HULL telling Victim 2 that the police were outside. Victim 2 began to cry and told an FBI agent that HULL was going to know Victim 2 was talking to the police. Later during the interview, the UC received a text from HULL Phone B stating "the police is about to arrest her driver can u have her to call now 911."

37. During subsequent interviews with the FBI in February 2012, Victim 2 said that HULL has been "prostituting" minor victims for some time, and that he had at least one minor victim at the time. Victim 2 said HULL had beaten her on numerous occasions, and had given her black eyes, busted lips, and a broken nose.

18

38.     In separate interviews, Victim 1 and Victim 4 have identified an unmarked photograph of Victim 2 by her nickname. During interviews with the FBI, Victim 1 described an occasion when HULL was driving and Victim 2 was "getting mouthy" with HULL, after which Victim 1 saw HULL hit the brakes on the car, get out of the car, grab Victim 2 by the hair, and pull her to the ground.

**B.     Victim 3**

39.     On June 21, 2012, an undercover law enforcement officer responded to a backpage.com advertisement for prostitution and arranged to meet a female at a motel in Alsip, Illinois. When a female arrived at the motel as scheduled, law enforcement officers arrested her and identified her as Victim 3, based on her Illinois driver's licnese. According to Victim 3 and Victim 3's driver's license, she was twenty-three years old at the time.

40.     After Victim 3's arrest, FBI agents interviewed her, and Victim 3 gave agents consent to search her cell phone. Victim 3's cell phone contacts list contained the phone number for HULL Phone B, which was assigned to the name "Killa Cam." Victim 3 identified this phone numbers as belonging to "Cam," who FBI agents believe to be CAMERON HULL. Victim 3 said she has known HULL for a long time, and that in the winter of 2011, at a motel in Joliet, Illinois, HULL asked Victim 3 to be his "bottom bitch." Based on my training and experience, I know that the term "bottom bitch" refers to the female who is a pimp's most veteran or most favored prostitute, and who performs additional responsibilities.

19

41.     Victim 3 also said that about a week before June 21, 2012, HULL called her and asked her to work for him as a prostitute. HULL told Victim 3 that they would "go halves," which Victim 3 understood to mean that HULL would post prostitution advertisements for Victim 3, and Victim 3 would give half of the money she made from commercial sex acts to HULL.

42.     In separate interviews, Victim 1 and Victim 4 have identified an unmarked photograph of Victim 3 by Victim 3's first name. As described above, Victim 1 has explained multiple occasions when Victim 3 was present for significant events during the time HULL trafficked Victim 1.

**C.     Victim 4**

43.     Since approximately October 2012, FBI agents have interviewed Victim 4 multiple times. According to Victim 4 and to NCIC records, Victim 4 is 21 years old. Victim 4 identified HULL by his unmarked Illinois driver's license photograph and other photographs. According to Victim 4, during a period of time that FBI agents believe was in approximately the fall of 2011, Victim 4 worked as a prostitute for HULL.

44.     Victim 4 described working as a prostitute for HULL in the Chicago area, usually through advertisements that HULL posted on backpage.com, and also occasionally on the track. Victim 4 said HULL transported her to and from dates in his white van, explained that she often went on ten or more dates per day, and said that during the dates she had sex with customers in exchange for money. Victim 4 has identified multiple prostitution advertisements from backpage.com that, according to

20

Victim 4, are advertisements for her and other victims, and that were posted during the time she worked for HULL. For example, Victim 4 identified an advertisement dated December 1, 2011, which is entitled, "girls gone wild." The advertisement lists the telephone number for HULL Phone A. The advertisement contains multiple photographs that Victim 4 identified as herself as well as Victims 3, 7, and 8.

45.     Victim 4 explained that she had romantic feelings for HULL, and that HULL told her he loved her, he wanted to be with her, and he wanted to have babies with her. According to Victim 4, she was "head over heels" for HULL.

46.     Victim 4 said that, at HULL's instruction, she usually charged between $100 and $200 for each date in which she performed a commercial sex act, and that she usually gave HULL all the money she made, because HULL told her that is what she should do. Victim 4 described an incident when she attempted to take money that she had made from sex acts, and HULL became angry and physically attacked her, punching her all over her body. After this incident, Victim 4 said there were numerous other incidents where HULL physically abused her, including by punching her in the face and all over her body, and pulling her hair until she had bald spots on parts of her head.

47.     Victim 4 described one specific incident of abuse, where HULL became angry because he believed Victim 4 was "messing" with his phone. According to Victim 4, HULL bit her on her back with his "grill"—a metal cover on his front teeth.[9] During

_____

[9] A photograph of HULL posted on the Subject Facebook Account shows that he does, in fact, have a grill on his front teeth.

the same incident, Victim 4 said that HULL choked her until she became temporarily unconscious.

48.     Victim 4 described another incident at a motel in Joliet, Illinois when HULL became angry at Victim 4 for fighting with Victim 3 and Victim 8. According to Victim 4, HULL punched her all over her body until she was bleeding, and there was blood covering the bathroom floor. Victim 4 described another incident at a motel in the suburbs of Chicago when HULL raped her by having sexual intercourse with her after she repeatedly told him "no." According to Victim 4, after HULL raped her, he took her money and her bus card and left her at the motel.

49.     **Victims 5-8**

50.     Victim 1 described four additional female victims, Victims 5-8, among others, who Victim 1 said HULL trafficked in or around November 2011 at the same time that he trafficked Victim 1. Victim 1 has identified photographs of Victims 2, 3, 6, 7, and 8.[10]

51.     According to Victim 1, during the time Victim 1 worked for HULL, another person, Individual B, told Victim 1 that Victim 7 was sixteen years old. Victim 1 said that when she worked for HULL, she asked HULL about Victim 7's age, and HULL confirmed that Victim 7 was sixteen. During Victim 1's September 7, 2012 consensually recorded telephone conversation with HULL at 2:59 p.m. described above, Victim 1 told HULL, "I did not like [Victim 7]. I was not fixing to be around her!"

---

[10] Victim 1 identified Victims 7 and 8 in the photograph that Victim 1 provided the FBI, as described in paragraph 23.

HULL asked, "With [Victim 7]?" and Victim 1 said, "Yeah." Victim 1 continued, "She was too young for you, and HULL said, "She's bad." Victim 1 said, "Sixteen [years old] with a, a, a big mouth. . . . She was too young to be acting the way she did."

## IV.    HULL's Use of Subject Phone 1 in Furtherance of the Subject Offenses

52.    According to records from Sprint/Nextel, Subject Phone 1 has the same subscriber and billing account number as HULL Phone B. On February 4, 2013, HULL posted a message on the Subject Facebook Account stating, "New phone number," and later posted a comment to another message stating, "i put my number in my fb contact [HULL listed his new phone number in the contact information section of the Subject Facebook Account]." On February 5, 2013, the "contact information" section of the Subject Facebook Account listed HULL's phone number as Subject Phone 1.

53.    On March 8, 2013, at approximately 10:06 p.m., Victim 1 had a consensually recorded telephone conversation with HULL, who was using Subject Phone 1. HULL told Victim 1 that he was in Grand Rapids, Michigan. HULL also said, "I been doing this shit [sex trafficking] every day. Since . . . the last time I seen you . . . Every day." HULL told Victim 1, "I got girls [prostitutes] in Ohio. I got girls out here in Michigan. I got a girl . . . in South Carolina. I got three in Chicago. . . I start spreading my shit around."

54.    A public Internet search shows an advertisement for prostitution dated March 12, 2013 on backpage.com entitled "2 girl early bird special!!!! 160$ special and up ins/outs." The advertisement contains photographs of a female, lists Subject Phone 1, and lists the location as Grand Rapids, Michigan. On March 13, 2013 at 4:50 a.m.,

23

HULL posted an image on the Subject Facebook Account stating, "2 Girl $PECIAL$."
At 4:50 a.m., HULL posted a photograph of a large amount of cash, and commented,
"That 2 for 1 is the shit." GPS records from Sprint/Nextel show that on March 12 and
13, 2013, Subject Phone 1 was located in Grand Rapids, Michigan.

55.     Recent GPS data for Subject Phone 1 has located that phone near
locations where HULL appears to be involved in sex trafficking. For example, on
February 5, 2013, at approximately 7:39 a.m., a message was posted on the Subject
Facebook Account, stating, "On the Track lets get it girls! EARLY at 4154 W. North
Ave. Chicago, IL 60639." This address is located near North Avenue and Keeler on the
west side of Chicago. According to GPS records from Sprint/Nextel, on February 5,
2013 from approximately 6:50 a.m. to approximately 10:21 a.m., Subject Phone 1 was
in the vicinity of North Avenue and Cicero Avenue in Chicago, which, according to
members of the Cook County Sheriff's Police Department's vice squad, which monitors
prostitution activity in the area, is known to be a track.

56.     According to records from Sprint/Nextel, between February 4, 2013 and
March 14, 2013, with the last contact on March 14, 2013, there have been a total of
approximately 19,991 contacts over Subject Phone 1, an average of approximately 500
contacts per day. Based on my training and experience, I believe this volume of
contacts is consistent with a person who is involved in sex trafficking, and whose phone
is being used to communicate with large numbers of customers, victims, or potential
victims.

57.     Based on my training and experience, it is common for sex traffickers to use cell phones in furtherance of sex trafficking offenses. For example, it is common to: (a) contact victims or potential victims by telephone; (b) use a telephone to post Internet advertisements for prostitution; (c) list telephone numbers in Internet advertisements for prostitution, so that customers can contact victims on those telephone numbers; (d) take photographs and videos of victims for use in prostitution advertisements. As explained above, there is probable cause to believe that HULL has used Subject Phone 1 to do some or all of these things. Therefore, there is probable cause to believe that Subject Phone 1 contains evidence of the Subject Offenses.

## V.     HULL's Use of the Subject Facebook Account in Furtherance of the Subject Offenses

58.     According to records from Facebook the Subject Facebook Account is subscribed to CAMERON HULL and has "vanity" nickname "KingKilla Hull." An FBI agent has identified the photograph on Facebook purporting to be the user of the account as HULL, based on HULL's Illinois driver's license photograph. The FBI has access to HULL's Facebook account through an undercover law enforcement Facebook account that is "friends" with HULL, and can therefore see content on HULL's Facebook page.

59.     On November 9, 2012, an FBI employee served on Facebook a search warrant for the Subject Facebook Account issued by Magistrate Judge Mason on November 9, 2012. On November 27, 2012, Facebook provided the FBI with the material for the Subject Facebook Account covered by the search warrant. As described

25

below, since the FBI obtained this material, there is probable cause to believe that additional evidence of the Subject Offenses can be found in the Subject Facebook Account.

60.     On December 25, 2012, at approximately 7:04 p.m., HULL posted a message to the Subject Facebook Account stating, "On this paper chase [trying to obtain money]! Know Yal tricks [prostitutes] got sum trick money [money earned from sex acts] I got em on deck! Lol Church!!!!" Based on my training and experience, I know that "Church" is a term frequently used by pimps, and that, among other meanings, it can be used as an exclamation, or as a term celebrating the pimp.

61.     On December 28, 2012 at approximately 6:30 a.m. someone posted a comment on the Subject Facebook Account asking, "wat been good u still pimpin huh[?]" At approximately 6:44 a.m., HULL responded, "sure is!" Later on December 28, at approximately 4:22 p.m. HULL posted a message on the Subject Facebook Account, saying, "Bout to post[,] who wanna check a bag[,] inbox me [HULL was about to post online advertisements for prostitution, and was inviting females to wanted to make a "bag" full of money through commercial sex acts to send a message to HULL's Facebook inbox]."

62.     On December 31, 2012 at approximately 3:19 a.m., HULL posted a message on the Subject Facebook Account saying, "I'm a money getting nigga and these bitches is wat I'm known for church!!!!!" At approximately 3:37 a.m. someone posted a comment saying, "I heard lil goldie 4 pimp game stronger [the commenter heard that a pimp named Lil Goldie, who was a member of the Four Corner Hustlers street gang,

26

was a stronger pimp than HULL]." At approximately 3:50 a.m., HULL replied, "I learned from the best 4 [HULL learned how to be a pimp from the best] got it all in my bones! U know most of the real pimps in Chicago r 4chs [Four Corner Hustlers]! Church!!!! And ask about me. Goldie know I'm a beast he a Gorilla I'm a Beast we both Solid 4 [Four Corner Hustlers] til the world blow! Church!" Based on my training and experience, I know that "gorilla" is a word commonly used for pimps who use threats and violence to control their victims, and "beast" is a word commonly used for pimps who dominate their victims, usually through violence.

63. On January 4, 2013, at approximately 9:54 a.m., HULL posted on the Subject Facebook Account a photograph of a person flashing a stack of money. At the same time, HULL posted the following link on his Facebook wall: "BREAKING NEWS: Federal Judge Sides with Backpage.com and Blocks Tennessee Sex Trafficking Law."[11] Later on January 4, at approximately 9:19 p.m. HULL posted the message, "On the blade, wtf!" Someone commented by asking HULL what he meant, and at 9:20 p.m., HULL responded, "The Track!" A few minutes later at about 9:49 p.m., HULL posted, "The Blade crackin its turnt up we bout to check a bag [make a bag full of money from commercial sex acts on the track]."

64. On January 23, 2013, at approximately 5:08 a.m., HULL posted a photograph on the Subject Facebook Account depicting $100 bills fanned out over a

---

[11] This headline was linked to a news article, the first sentence of which stated, "Siding with Backpage.com, a federal judge in Tennessee banned state law enforcement authorities from enforcing a new law aimed at curbing the sex-trafficking of teens."

counter top or table. HULL posted a caption to this photograph stating, "Mfks [motherfuckers] think Killa [HULL's nickname] be playin! King Killa P I been a hustla!" The next day, January 24, 2013 at approximately 1:56 p.m., HULL posted a comment to the photograph stating, "I don't got no job im tax free! Church. . . . i wish i could get taxes but uncle sam say pussy is tax free [HULL does not pay taxes on money he makes from the commercial sex acts of his victims]!"

65.     On February 27, 2013, at 1:58 a.m., HULL posted a message on the Subject Facebook Account stating, "Trapping [making money from illegal activity]!!! International Pimping! I love my job so do dat sick shawty then sock dat money to my pockets [HULL is telling prostitutes to commit commercial sex acts and give him the money]. I'm chopping the blade [working the track]." HULL's Facebook messages lists his location at a Ramada hotel in Grand Rapids, Michigan. According to GPS records from Sprint/Nextel, on February 27, 2012, Subject Phone 1 was in Grand Rapids, Michigan.

66.     On March 6, 2013 at 1:36 p.m., HULL Posted a message on the Subject Facebook Account stating, "Trapping bitch Betta have my money [prostitutes better have money to pay HULL from commercial sex acts]!" HULL's Facebook message lists his location at a Holiday Inn Express in Grand Rapids, Michigan. According to GPS records from Sprint/Nextel, on March 6, 2013, Subject Phone 1 was in Grand Rapids, Michigan.

67.     Based on my training and experience, I know that it is common for sex traffickers to use Facebook to facilitate sex trafficking. Among other things, traffickers

use Facebook to recruit and attempt to recruit new victims, communicate with victims, and to publicize the trafficker and his exploits in an attempt to attract victims. Traffickers do this by collecting victims and potential victims as "friends," by communicating through comments posted on the traffickers "Wall" or the "Walls" of others, by posting photographs and videos, and by sending inbox messages through Facebook.

68.     Based on my training and experience, I know that a search of Facebook accounts contents often yields investigative leads relating to:

    a.     the identities of co-conspirators, victims, and other people involved in the Subject Offenses;

    b.     the contact information of co-conspirators, victims, and other people involved in the Subject Offenses;

    c.     the timing of communications among co-conspirators, victims, and other people involved in the Subject Offenses; and

    d.     the methods and techniques used in committing the Subject Offenses.

69.     Based on my training and experience, I am aware that it is common for people to keep content on their Facebook account, including photographs, "Wall" postings, and private messages, for months and years. I am also aware that if a user deletes content from his Facebook account, the data may still exist on the provider's servers, or may be recoverable by the provider.

29

70. Therefore, there is probable cause to believe that evidence of the Subject Offenses will be found on the Subject Facebook Account.

## VI. Background on Facebook

71. Based on my training and experience, I have learned the following about Facebook:

a. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.Facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

b. Facebook asks users to provide basic contact information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

c. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook

30

accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

d.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

e.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

f.     Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is

31

the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

g.      Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

h.      Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

i.      The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

j.      Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

32

k.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

l.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

m.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

33

n.      Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

72.      Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application.  In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Facebook to make a digital copy of the entire contents of the information subject to seizure specified in Section II of Attachment A. That copy will be provided to me or to any authorized federal agent.  The contents will then be analyzed to identify records and information subject to seizure pursuant to Section III of Attachment A.

## VII. Search Procedure With Respect to Facebook

73. In order to facilitate seizure by law enforcement of the records and information described in Attachment A, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to permit employees of Facebook to assist agents in the execution of this warrant. In executing this warrant, the following procedures will be implemented:

a. The search warrant will be presented to Facebook personnel who will be directed to the information described in Section II of Attachment A;

b. In order to minimize any disruption of computer service to innocent third parties, Facebook employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II of Attachment A, including an exact duplicate of all information described in Section II of Attachment A;

c. Facebook employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A and all information stored in those accounts and files to the agent who serves this search warrant; and

d. Following the protocol set out in the Addendum to Attachment A, law enforcement personnel will thereafter review all information and records received from Facebook employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A.

35

## CONCLUSION

74.    Based on the information in this affidavit, there is probable cause to believe that CAMERON HULL has committed a violation of Title 18, United States Code, Section 2423(a) as charged in the criminal complaint, and that evidence, instrumentalities, and contraband of the Subject Offenses will be found in Subject Phone 1 and the Subject Facebook Account.

FURTHER AFFIANT SAYETH NOT.

MICHAEL BARKER
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
before me this 15th day of March, 2013

Honorable Arlander Keys
United States Magistrate Judge

36