UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA   )
                               )     No.    13 CR 216
          v.               )
                               )     Hon. John Z. Lee
CAMERON HULL              )

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits the following Sentencing Memorandum in support of its position that Cameron Hull should be sentenced to a term of imprisonment of 121 months, which is at the low end of the applicable advisory Sentencing Guidelines range.[1]

## I.    BACKGROUND

On January 9, 2015, defendant Cameron Hull pleaded guilty, pursuant to a plea agreement, to the superseding information in this case, which charged him with facilitating the travel of a person in interstate commerce for the purpose of illicit sexual activity, in violation of Title 18, United States Code, Section 2423(d). Defendant is scheduled for sentencing on September 17, 2015, at 11:00 a.m.

---

[1] The government respectfully requests *instanter* a one-day extension of time to submit this sentencing memorandum, in light of the fact defense filed its sentencing memorandum and objections on September 10, 2015. The government also respectfully seeks *instanter* leave to file a sentencing paper that exceeds fifteen pages in order to fully address defendant's objections to the guideline calculations, the 3553 factors, and the recommended conditions of supervised release. Counsel for defendant Hull has no objection to the government's requests.

A. **Factual Background**

The facts of this case and the government's calculation of the applicable advisory sentencing guidelines were set forth in the plea agreement and in detail in the government version of the offense and attachments thereto, which are attached to the Presentence Investigation Reports ("PSR") and incorporated by reference herein.

In summary, in the fall of 2011, defendant and Victim BH spoke via telephone. During this conversation, Victim BH agreed to work as a prostitute under defendant's employ. At this time, Victim BH was 16 years of age and living in a "flop house" owned by her stepfather's adoptive mother. Victim BH had grown up in multiple foster homes, at the last of which she had been subject to sexual abuse and had run away. After speaking on the phone, defendant and BH met in person. During this meeting, defendant agreed to act as Victim BH's pimp; that is defendant agreed to post advertisements on the internet to help Victim BH obtain clients, facilitated her travel to meetings with clients where she would have sex with them in exchange for money, and provide protection to Victim BH while she met with clients. In exchange, Victim BH agreed to pay defendant between 20 and 30 percent of the profits she made performing commercial sex acts and also to pay some of her expenses, such as the cost of motel rooms and car repair.

Starting in at least November 2011 and continuing until at least December 2011, while Victim BH was 17 years of age, defendant acted as Victim BH's pimp as well as the pimp of about 4-6 other females, including various adults such as

2

Individual NO, Individual IH, and Individual TK, who ranged in age from 18 years old to 24 years old. Using a computer and/or smart phone, defendant posted advertisements for Victim BH and Individuals NO, IH, and TK on backpage.com, advertising them for commercial sex. While in Illinois, defendant spoke to Victim BH and these individuals on the phone and through Facebook to arrange to meet them in various locations, including Indiana, so they could work in Illinois and Indiana as prostitutes under his employ.

In November 2011, defendant facilitated the travel of Victim BH and Individual IH to a motel in Indiana, where he posted advertisements on the internet, advertising these two individuals and other prostitutes in his employ for commercial sex. defendant, Victim BH, and other individuals working as prostitutes for defendant then traveled back to Illinois, where defendant again advertised these individuals for commercial sex, and took a percentage of the profits they made.

On average, the individuals working as prostitutes for defendant charged each customer $150. Victim BH worked under defendant's employ from approximately November 2011 through approximately December 2011.

### B.   Guidelines Calculation and Presentence Investigation Report

In his sentencing memo, defense contests only one aspect of the guideline calculation:  the agreed-upon 2-level enhancement for use of a computer under

U.S.S.G. § 2G1.3(b)(3)(B). R.59 at 5; R.79 at 1.[2]  Defense argues that, "The argument in favor of the electronic-means enhancement is based on Mr. Hull's use of a website to advertise prostitution services.  According to the Guidelines Manual and this Circuit, the enhancement applies only when the defendant used an electronic means to communicate directly with the minor victim.  There is no evidence that Mr. Hull used an electronic device to communicate directly with BH." *Id.*  Defense cites to *United States v. Patterson*, 576 F.3d 431, 443 (7th Cir. 2009) in contesting the enhancement under 2G1.3(b)(3)(B).

However, defense overlooks a more recent Seventh Circuit case, decided earlier this year and cited in the Government Version, in which Judge Posner explicitly distinguished *Patterson* and held that the 2-level guideline enhancement for use of computer applies to the posting of online advertisements:

> The defendant argues that the court improperly increased his guidelines range because of his use of a computer. *See* U.S.S.G. § 2G1.3(b)(3)(B). He points out that Application Note 4 states that "Subsection (b)(3) is intended to apply only to the use of a computer or an interactive computer service to communicate directly with a minor or with a person who exercises custody, care, or supervisory control of the minor. Accordingly, the enhancement in subsection (b)(3) would not apply to the use of a computer or an interactive computer service to obtain airline tickets for the minor from an airline's Internet site." But the note is wrong. *The guideline section provides a 2–level enhancement whenever the defendant uses a computer to "entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct*

---

[2]     Despite the dispute anticipated in the government version, defense has not contested in his sentencing paper the amount of money defendant received from pimping, the fact defendant knew Victim BH was underage, or the fact that defendant had sex with Victim BH while she was a minor.  As detailed in the government version, these facts are corroborated not only by the sworn testimony of Victim BH and the other girls that engaged in commercial sex acts for defendant's profit, but also by undercover recordings between Victim BH and defendant, which are detailed in and attached to the government version.

> *with the minor,"* which the defendant did when he created Craigslist pages on which to advertise *Jessica's and the girls' services as prostitutes.* When an application note clashes with the guideline, the guideline prevails. *Stinson v. United States*, 508 U.S. 36, 38, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).

> It's true that *United States v. Patterson*, 576 F.3d 431, 443 (7th Cir. 2009), applied the application note, despite its inconsistency with the guideline, without attempting to distinguish, or even citing, *Stinson*. But *Patterson* is distinguishable from the present case, because the government there had conceded, albeit erroneously, that the application note controlled; we had no reason to reject a party's concession regarding an issue raised by its opponent.

> Moreover, any doubt about the applicability of *Stinson* to the computer-use guideline is dispelled by the lengthy analysis of the issue in *United States v. Pringler*, 765 F.3d 445, 451–55 (5th Cir. 2014). And as pointed in that opinion, "the [computer-use] enhancement would not have been applicable [in *Patterson*], irrespective of application note 4," because "neither the defendant nor someone part of the same criminal activity used a computer to solicit patrons," id. at 454 n. 4, as was done in both *Pringler* and our case today. Essentially, then, the statement in *Patterson* about the application note is dictum.

*United States v. McMillian*, 777 F.3d 444, 449-50 (7th Cir. 2015) (emphasis added).

*See also United States v. Hill*, 783 F.3d 842, 846 (11th Cir. 2015) (citing *McMillian*,

adopting *Pringler*, explaining that "the drafting history of the Guideline shows that

applying application note 4 to Subsection 3(B) is the result of a drafting error"

intended to apply only to the situation posited in U.S.S.G. § 2G1.3(b)(3)(A),

agreeing that the plain language of U.S.S.G. § 2G1.3(b)(3)(B) controls over the

inconsistent application note, and holding that use of a cellphone to place online ads

"fall squarely within the language of the enhancement.")

Defendant admitted in his plea agreement that he used a smart phone to post advertisements for his victims on backpage.com. R.59 at 3. This qualifies him for this enhancement pursuant to *McMillian*.

In addition, defendant used a cell phone to communicate directly with minor victims in order to facilitate the victims' travel to locations where they committed commercial sex acts. Under the guideline, a cell phone is a computer, and so the enhancement applies. The guideline uses the same definition of computer found in 18 U.S.C. § 1030(e)(1). *See* § 2G1.3(b)(3)(A), cmt. n.1. The statute, in turn, defines "computer" to include "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions." This definition is "exceedingly broad," and it includes an ordinary cellular telephone, even one that does not connect to the Internet. *United States v. Kramer*, 631 F.3d 900, 902-04 (8th Cir. 2011). While the statute's breadth "might prompt Congress to amend the statute[, it] does not authorize the judiciary to give the existing version less coverage than its language portends." *United States v. Mitra*, 405 F.3d 492, 495 (7th Cir. 2005). Because defendant used a cell phone to directly communicate with victims and facilitate their travel to and from their meetings with customers, the enhancement also applies.

The Presentence Investigation Report ("PSR"), which was prepared on May 26, 2015, agrees that the 2-level computer enhancement applies, and indicates that, "The offense level and criminal history calculation contained herein are in agreement with those contained in the written plea agreement." PSR at 21 ¶ 111.

6

As outlined in the plea agreement and in the PSR, based on a total offense level of 30 and a criminal history category of III, the guideline imprisonment range is 121 months to 151 months. These calculations are based on the following guidelines, as more fully explained in the plea agreement, government version, and PSR:

| | |
|---|---|
| Base Offense Level: | 24 (Guideline § 2G1.3(a)(4)) |
| Use of Computer/Smartphone: | +2 (Guideline § 2G1.3(b)(3)(A and B)) |
| Commercial Sex Act: | +2 (Guideline § 2G1.3(b)(4)(B)) |
| Acceptance of Responsibility: | -3 |
| Pattern of Sex Trafficking: | +5 (Guideline § 4B1.5(b)(1)) |
| Total: | = 30 |

## III. Defendant Should Be Sentenced to 121 Months' Imprisonment.

A sentence at the low end of the advisory guidelines range of 121 to 151 months' imprisonment for this defendant best reflects the serious nature and circumstances of the defendant's crime, his history and characteristics, and the goals and purposes of sentencing, as set forth in 18 U.S.C. § 3553(a). Given the seriousness of the offense, the need to promote respect for the law, and the need to generally deter others, the government respectfully submits that a sentence less than 121 months' imprisonment would not adequately address the goals and purposes of sentencing.

### A. The Seriousness of Offense

The seriousness of defendant's crime cannot be overstated. When the defendant was a 31-year old man, he victimized and manipulated for his own financial benefit a 16-year old girl who had bounced from foster home to foster home, had been sexually abused, and was a runaway. She was living in a four-room home with about twenty people, and she could not afford the rent she was supposed to pay her stepfather's adoptive mother to stay there. The defendant knew Victim BH was a minor. He plied her with alcohol and marijuana. He enticed and manipulated Victim BH with promises of love and family, and then sent her out on the dangerous streets of Chicago to be exploited by strange adult men just so he could line his pockets with cash. Defendant coaxed Victim BH to engage in commercial sex acts with strangers and give defendant a portion of the profits using various types of coercion, including telling her that he loved her and wanted her baby.

Also, as detailed in the grand jury testimony of Individuals NO and TK, which is attached to the government version, defendant used violence against victims. On multiple occasions, defendant beat Individual NO, causing black eyes, a broken notes, and a cut lip. Individual TK performed, on average, at least 10 commercial sex acts per day while working for the defendant. Individual TK worked alongside another 16-year old victim named "juicy." When Individual TK attempted to withhold money from the defendant, he attacked and punched her, pulling her hair so hard it caused bald spots. Defendant also choked Individual TK until she became unconscious. The defendant engaged in an ongoing sex offense

against multiple victims in multiple states. Victim BH's grand jury testimony describes her observation of and interactions with defendant's other victims. Also, as detailed in paragraphs 57-68 of the complaint affidavit, defendant's Facebook activity shows that he continued to actively engage in sex trafficking of young females in early 2013.

The damage that has been done to Victim BH and others in defendant's employ can never be undone. For just a few thousand dollars, the defendant has ruined Victim BH's life and the life of countless other victims.

The victims' psychological scars are even deeper than the sexual abuse they suffered. Studies show that the victims face increased risk of post-traumatic stress disorder and its symptoms of flashbacks, insomnia, and fear of sexual contact; depression and bipolar disorder; attention deficit hyperactivity disorder; and alcohol and drug dependency. See Sentencing Exhibit A.[3]

As explained in the attached testimony of Dr. Cooper, defendant has also placed his victims at much higher risk of being trafficked again. Victims of sex trafficking often experience low self-esteem, self-blame, guilt, and feelings of

---

[3] This exhibit consists of excerpts of testimony of Dr. Sharon Cooper in two federal criminal trials in other districts, and an excerpt from a chapter in the book Dr. Cooper edited, James A. Farrow, MD, "Psychosocial Context Leading Juveniles to Prostitution and Sexual Exploitation," in Cooper, Sharon W., Richard J. Estes, Angelo P. Giardino, Nancy D. Kellogg & Victor I. Vieth (Editors), *Medical, Legal, and Social Science Aspects of Child Sexual Exploitation: A Comprehensive Review of Pornography, Prostitution, and Internet Crimes* (St. Louis Mo: GW Medical Publishing 2005).

depression, worthlessness, and shame, making them more vulnerable to the next sex trafficker. *See* Sentencing Exhibit B.[4]

Less tangibly, defendant robbed all of the victims of their innocence. Defendant corrupted the victims' sexuality, making sex a commodity for him to exploit, and making some of their earliest sexual experiences ugly, painful, and disgusting. Defendant stole the victims' trust, by promising love and money and flashy lifestyles, but then used their bodies to make him money and manipulated and belittled them to maintain his control. All of these effects were magnified because of the victims' young ages and backgrounds—defendant knew his victims were vulnerable, impressionable, and malleable.

Defendant's victims live every day with the consequences of these crimes. For some, it will be difficult to ever trust a man again. It will be difficult to have a healthy sexual relationship again. It will be difficult to see themselves as people worthy of love and respect.

The Seventh Circuit has noted the incredible seriousness of offenses involving prostitution and minors. *See United States v. Shannon*, 110 F.3d 382, 386 (7th Cir. 1997) ("The younger child is likely to have poorer judgment, less knowledge about sex, and less money, all of which deficits will make it less likely that she will use or insist that her partner use effective measures to prevent pregnancy and disease.

---

[4] This exhibit consists of excepts of testimony of Dr. Sharon Cooper in a federal criminal trial in another district.

She is also less likely to be a responsible expectant mother, so there is danger to her fetus").

In sum, the seriousness of the offense favors a sentence of 121-months' imprisonment.

### B.    History and Characteristics of Defendant

The defendant's history and characteristics also counsel in favor of a sentence of 121 months' imprisonment.  As a fact not to be overlooked, defendant has approximately 16 children with approximately 16 different women, none of whom he has married.  PSR ¶ 78.  These children range in age from 10 years old to under 2 years old, and reside in at least 8 different cities in about 5 different states.  *Id.* Defendant cannot recall the name of his youngest child, or the woman who gave birth to that child.  *Id.*  Defendant has not made any voluntary payments toward the $58,167 child support balance he became aware of in 2008.  *Id.* at 80.  He claims "provided assistance to his children as he was able," but according to the PSR, defendant has child support arrearages in Illinois, Tennessee, and Ohio.  *Id.* at 104. Defendant's mother told the probation officer that the defendant "has never been disrespectful to women."  *Id.* at 83.  However, defendant's extreme track record speaks otherwise of defendant's complete disregard of women and children.

Defendant reported to the probation officer that he received an Associate of Arts degree in Culinary Arts in 2003.  *Id.* at 98.  If this is true, the defendant had opportunity to make a respectable living, but chose not to do so.  Rather than choosing gainful employment for himself, defendant made the decision to profit off

11

his repeated and ongoing victimization of multiple vulnerable young women and juveniles. Defendant not only knew better, but had the resources to be better, and he chose not to use those resources. A sentence at the low end of the guideline range reflects the reality that defendant had options, but instead chose a career in sex trafficking vulnerable females as a means to make himself quick, easy cash.

Although the defendant's criminal history contains no significant convictions that approach the magnitude of his present crime, he has had a significant number of encounters with law enforcement beginning at the age of 17 (the same age as Victim BH). As detailed in the PSR, defendant has eight convictions and an additional 14 arrests from age 17 until his arrest in this case at age 32. Despite all of these encounters with the criminal justice system, defendant never received a jail sentence of more than two years. These light sentences failed to deter the defendant from engaging in sex trafficking. A sentence of 121-months imprisonment will deter the defendant, and others, from engaging in similar conduct and will protect the public from future crimes by the defendant.

For all of these reasons, a sentence of 121-months imprisonment, at the low end of the advisory guidelines range, is warranted in this case and for this defendant.

## C.      The Need to Provide Just Punishment for the Offense

Although defendant's crime is no doubt horrific and will result in a life sentence of mental anguish for his victims, a sentence of 121 months' imprisonment would provide just punishment for the offense. This sentence should certainly send

the message to the defendant and others that this type of depraved behavior in preying on juveniles and young women and profiting off of their sexual exploitation will not be tolerated.

The defense notes in mitigation that, since being detained, the defendant has taken advantage of opportunities such as substance abuse treatment, cognitive skills education, and work as an orderly, barber, and computer technician.  R. 79 at 3.  With a sentence of 121 months' the defendant will have time to continue to take advantage of those opportunities, will be released from prison (with good time credit) at about age 41, and hopefully will have the tools to turn his life around and contribute something to society.

### D.    The Recommended Sentence Would Not Create Unwarranted Sentencing Disparities

A sentence of 121-months would not create unwarranted sentencing disparities.  In the last eight years in the Northern District of Illinois, defendants convicted of sex trafficking offenses have received sentences ranging from 84 month to life imprisonment.  In fact, the sentence of 84 months in the *Spears* case is an outlier below the next lowest sentence of 102 months imprisonment in the *McKee* case, which was imposed on a defendant with much more mitigating circumstances than Hull's—McKee alleged at sentencing that he himself had been a victim of sex trafficking by his own mother.  *See United States v. Victor Powell*, 04 CR 855 (sentenced in 2008 by Judge Manning to 360 months imprisonment); *United States v. Jody Spears*, 06 CR 482 (sentenced in 2007 by Judge Kocoras to 84 months

13

imprisonment); *United States v. James Patterson*, 06 CR 624 (sentenced in 2010 by Judge Guzman to 262 months imprisonment); *United States v. Alex Campbell*, 10 CR 26 (sentenced in 2012 by Judge Gettleman to life imprisonment); *United States v. Datqunn Sawyer*, 10 CR 744 (sentenced in 2012 by Judge Kocoras to 50 years imprisonment); *United States v. Eric Shamsud-din*, 10 CR 927 (sentenced in 2013 by Judge St. Eve to 15 years imprisonment); *United States v. Carl Brandon Smith*, 12 CR 246 (sentenced in 2014 by Judge St. Eve to 30 years imprisonment); *United States v. Malik McKee*, 12 CR 707 (sentenced in 2014 by Judge Coleman to 102 months imprisonment); *United States v. Arnell Chase Mischer* (sentenced in 2015 by Judge Leinenweber to 10 years imprisonment).

Of note, if defendant had been convicted of the original charge of 2423(a), he would have been subject to a mandatory minimum sentence of 10 years imprisonment. In addition, if defendant had been charged and convicted of sex trafficking by force, fraud, or coercion under 18 U.S.C. § 1591, he would have been subject to a 15-year mandatory minimum sentence.

Under this analysis, a sentence of 121-months, at the low end of defendant's advisory guideline range, would not create an unwarranted sentencing disparity.

### E. Restitution.

Defendant agreed in the plea agreement that, pursuant to 18 U.S.C. § 3663A, the Court must order defendant to make full restitution to the victims. R.59 at 9. Defendant's victims are owed restitution for the "full amount of [their] losses." 18 U.S.C. § 1593(a). *See also* 18 U.S.C. § 3663A. The statute defines these losses as

14

the "greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." *Id.* One accepted method of calculating the restitution owed to a sex trafficking victim is to compute the amount of money the defendant made by using the victim's estimate of the number of commercial sex acts she engaged in and at what price. *See United States v. Webster*, 2011 WL 8478276 (9th Cir. 2011); *United States v. Fu Sheng Kuo*, 620 F.3d 1158 (9th Cir. 2010) ("The district court held that the victims were entitled to restitution in the amount of the average customer charge for each sex act multiplied by the total number of sex acts performed.").

Here, Victim BH engaged in commercial sex acts with approximately 200 men while working for the defendant. She charged approximately $150 per customer, and the defendant kept approximately 25% of those earnings. Therefore, the defendant kept approximately $7500 of the approximately $30,000 received by Victim BH for engage in commercial sex acts. PSR ¶ 16. Based on these calculations, $7500 is a reasonable estimate of the restitution defendant owes to Victim BH.

## IV. Conditions of Supervised Release

Based upon the seriousness of defendant's crime and the relative ease with which he could recidivate, the United States recommends that the Court impose a five year term of supervised release with the conditions of supervised release set forth below.

## A.     Mandatory Conditions of Supervised Release

The following conditions are required by 18 U.S.C. § 3583(d):

1.  The defendant shall not commit another federal, state, or local offense. *See* 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a)(1).

2.  The defendant shall not unlawfully possess a controlled substance. *See* 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a)(2).

3.  The defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on probation and at least two periodic drug tests, and up to a maximum of 104 tests thereafter for use of a controlled substance. (Court may decline where it finds low risk of future substance abuse by the defendant). *See* 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a)(4).

4.  If a fine is imposed and has not been paid upon release to supervised release, the defendant shall adhere to an installment schedule set by the court for the payment of the fine. *See* 18 U.S.C. § 3624(e); U.S.S.G. § 5D1.3(a)(5).

5.  The defendant shall pay the assessment imposed in accordance with 18 U.S.C. § 3013. *See* 18 U.S.C. §§ 3663A and 3013; U.S.S.G. § 5D1.3(a)(6).

6.  The defendant shall comply with the sexual offenses registration and notification requirements listed at U.S.S.G. § 5D1.3(a)(7)(A) & (B), including registering with the state sex offender registration agency in any state where he resides, is employed, carries on a vocation, or is a student, and as directed by the probation office. 42 U.S.C. § 16913.

7.  The defendant shall submit to the collection of a DNA sample from the defendant at the direction of the U.S. Probation Office if the collection of such a sample is authorized pursuant to 42 U.S.C. § 14135a(a). *See* 8 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a)(8).

## B.     Discretionary Conditions of Supervision

The following conditions will facilitate supervision by the probation officer, encouraging compliance with the law and deter the defendant from future crimes:

16

8. The defendant shall not leave the judicial district in which the defendant is being supervised without the permission of the court or the probation officer. *See* U.S.S.G. § 5D1.3(c)(1).

9. The defendant shall report to the probation officer as directed by the probation officer. *See* U.S.S.G. § 5D1.3(c)(2).

10. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer. *See* U.S.S.G. § 5D1.3(c)(3).

11. The defendant shall notify the probation officer of any change in residence, employer, or workplace within 72 hours. *See* U.S.S.G. §5D1.3(c)(6).

12. The defendant shall permit the probation officer to visit the defendant at home or work at any reasonable time, and to confiscate any contraband in plain view of the officer. *See* U.S.S.G. § 5D1.3(c)(10).

13. The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer. *See* U.S.S.G. § 5D1.3(c)(11).

14. The defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay any unpaid amount of restitution, fines, or special assessments.  *See* U.S.S.G. § 5D1.3(c)(15).

15. The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon.  *See* U.S.S.G. § 5D1.3(d)(1).

The following conditions will serve to support the defendant's rehabilitation and reintegration into the community, provide him with needed medical care, and ensure that the defendant is engaged in lawful pursuits rather than criminal activity, in light of defendant's specific history and characteristics:

16. The defendant shall support the defendant's dependents and meet other family responsibilities (including, but not limited to, complying with the terms of any court order or administrative process pursuant to the law of a state, the District of Columbia, or any other possession or territory of the United States requiring payments by the defendant

17

for the support and maintenance of any child or of a child and the parent with whom the child is living. *See* U.S.S.G. § 5D1.3(c)(4).

17. The defendant shall work conscientiously at suitable employment or pursue conscientiously a course of study or vocational training that will equip him for suitable employment, unless excused by the probation officer. *See* U.S.S.G. § 5D1.3(c)(5).

18. The defendant shall refrain from binge drinking (meaning, drinking 5 or more drinks during a single period of approximately 2 hours); heavy drinking (meaning consuming 15 drinks or more per week), and drinking in dangerous situations, such as drinking while driving or operating machinery. *See* U.S.S.G. § 5D1.3(c)(7).

19. The defendant shall not meet, communicate, or otherwise interact with a person whom he knows to be engaged, or planning to be engaged, in criminal activity. *See* U.S.S.G. § 5D1.3(c)(9).

20. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court. *See* U.S.S.G. § 5D1.3(c)(12).

21. The defendant shall provide the probation officer access to any requested financial information necessary to monitor financial obligations imposed by the court. *See* U.S.S.G. § 5D1.3(d)(3).

22. The defendant shall participate in an available program approved by the U.S. Probation Office for substance abuse, which program may include testing to determine whether the defendant has reverted to the use of drugs or alcohol. *See* U.S.S.G. § 5D1.3(d)(4).

23. The defendant shall participate in an available mental health program approved by the United States Probation Office. *See* U.S.S.G. § 5D1.3(d)(5).

24. Because the instant offense of conviction is a sex offense, as defined in Application Note 1 of the Commentary to § 5D1.2, the defendant shall (A) participate in a program approved by the United States Probation Office for the treatment and monitoring of sex offenders; (B) be limited in his use of computer or interactive computer service; and (C) be required to submit to a search, at any time, with or without a warrant, and by any law enforcement or probation officer, of the defendant's person and any property, house, residence, vehicle, papers, computer, other electronic communication or data storage devices or media, and

18

effects upon reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the defendant, or by any probation officer in the lawful discharge of the officer's supervision functions. *See* U.S.S.G. § 5D1.3(d)(7).

25. The defendant shall participate in a mental health and/or sex offender treatment program. The specific program and provider will be determined by a probation officer. The defendant shall comply with all recommended treatment which may include psychological and physiological testing., The defendant shall maintain use of all prescribed medications. *See* PSR at 25.

26. The defendant shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. The defendant shall consent to the installation of computer monitoring software on all identified computers to which the defendant has access. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. The defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software. *See* PSR at 25.

27. The cost of the Computer and Internet Monitoring Program shall be paid by the defendant at the monthly contractual rate, if the defendant is financially able, subject to satisfaction of other financial obligations imposed by the judgment. *See* PSR at 25.

28. The defendant shall not possess or use any device with access to any online computer service at any location (including place of employment) without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system. *See* PSR at 25.

29. The defendant shall not, without the prior approval of a probation officer and treatment provider, engage in activities that will put him in unsupervised private contact with any person under the age of 18, or visit locations where children regularly congregate (e.g., locations specified in the Sex Offender Registration and Notification Act.). This condition does not apply to the defendant's children. *See* PSR at 26.

19

30. The defendant's employment shall be restricted to the district and division where he resides or is supervised, unless approval is granted by a probation officer. Prior to accepting any form of employment, the defendant shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community the defendant will pose if employed in a particular capacity. The defendant shall not participate in any volunteer activity that may cause the defendant to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider. *See* PSR at 26.

31. The defendant shall provide the probation officer with copies of the defendant's telephone bills, all credit card statements/receipts, and any other financial information requested. *See* PSR at 26.

32. The defendant shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in the judgment.

33. If unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, the defendant shall perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed. *See* U.S.S.G. § 5D1.3(e)(1).

34. The defendant shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision. *See* PSR at 25.

35. The defendant shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless the defendant is in compliance with the financial obligations imposed by the judgment. *See* PSR at 25.

36. The defendant shall pay any financial penalty that is imposed and remains unpaid at the commencement of the term of supervised release. The defendant's monthly payment schedule shall be an amount that is at least 10% of defendant's net monthly income, defined as income net of reasonable expenses for basic necessities such as food, shelter, utilities, insurance, and employment-related expenses. *See* PSR at 26.

37. The defendant shall notify, as directed by the Probation Officer, third parties of risks that may be occasioned by the defendant's criminal

record or personal history or characteristics and shall permit the Probation Officer to make such notifications and to confirm defendant's compliance with such notification requirement. *See* PSR at 26.

## CONCLUSION

For the reasons noted above, the government requests that this Court sentence defendant to a within guidelines sentence of 121 months' imprisonment, impose a supervised release term of five years with the conditions outlined above, and order restitution in the amount of $7500 to Victim BH.

Respectfully submitted,

ZACHARY FARDON
United States Attorney

By:     /s/ Michelle Nasser
        MICHELLE NASSER
        Assistant United States Attorney
        219 South Dearborn Street
        Chicago, Illinois 60604
        (312) 469-6201